## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER J. HUBBARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 8343 |
| v. | ) | |
| | ) | |
| M & K TRUCK CENTERS, and | ) | |
| M & K EMPLOYEE SOLUTIONS, LLC, | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Heather J. Hubbard sued M & K Truck Centers and M & K Employee Solutions, LLC (together, "Defendants") under Title VII of the Civil Rights Act alleging discrimination and hostile work environment based on her gender, and retaliation for engaging in protected activity. Before the Court is Defendants' motion for summary judgment, R. 28. For the following reasons, that motion is granted.

### Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To

defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background[1]

The following facts are undisputed unless otherwise noted.[2]

***Employment history and policies.*** Hubbard was hired as a Medium Duty Sales Representative at Defendants' Summit dealership in February 2016, a position she held until her termination in January 2017. DSOF ¶¶ 6, 57; PRSOF ¶¶ 6, 57. Among other things, Medium Duty Sales Representatives are expected to sell so-called "medium duty" trucks to businesses within an assigned territory, generate new customers and develop existing customers to increase truck sales, and meet with their customers in person. DSOF ¶¶ 8, 9; PRSOF ¶¶ 8, 9. Hubbard was the only female sales representative at the Summit dealership during her employment. PSOAF ¶ 14;

---

[1] For purposes of this order, "DSOF" refers to Defendants' 56.1 Statement of Facts at R. 30, and "PRSOF" to Hubbard's response thereto at R. 36; "PSOAF" refers to Hubbard's 56.1 Statement of Additional Facts at R. 36, and "DRPSOAF" refers to Defendants' response thereto at R. 51.

[2] Portions of Hubbard's responses to Defendants' Local Rule 56.1 Statement of Facts paragraphs 2-5, 11, 13, 19, 20, 29, 37, 38, 42, 46, 59-60, 62 and 65 are deemed admitted because she indicates that she can neither confirm nor deny the information contained therein. *See McGuire v. UPS*, 152 F.3d 673, 674 (7th Cir. 1998) (an answer that does not deny the allegations in the paragraph with citations to supporting evidence constitutes an admission).

DRPSOAF ¶ 14. Hubbard testified that management told her that her schedule was flexible so long as she was making her sales. PSOAF ¶ 8; DRPSOAF ¶ 8. Two months after Hubbard was hired, Dominic Mondo was also hired as a Medium Duty Sales Representative at the Summit dealership. He was told at that time that work hours were "open." DSOF ¶ 7; PRSOF ¶ 7; PSOAF ¶¶ 9, 18; DRPSOAF ¶¶ 9, 18. Hubbard and Mondo reported to the Summit dealership's Medium Duty Sales Manager, Hugh McKenty, who in addition to his managerial responsibilities, also had sales duties. DSOF ¶¶ 12, 13; PRSOF ¶¶ 12, 13; PSOAF ¶ 18; DRPSOAF ¶ 18.

***Internal complaints about McKenty.*** Hubbard met with Human Resources Manager George LaJeunesse on April 4, 2016 to complain that McKenty had made the following comments to her:

- "oh so you're not just a blond bitch"
- "he could fall in love with her"
- "he does not want to tell his wife that he is working with a hot blond"
- "she is living in sin because she is not married"
- "she should not refer to her fiancé as her fiancé but merely as a boyfriend because they are not married"
- "Heather is a sexy name"
- "I've got to be with this bimbo all day"

DSOF ¶¶ 14-15; PRSOF ¶¶ 14-15. LaJeunesse immediately initiated an investigation, during which McKenty admitted to making some of the comments. DSOF ¶¶ 17, 18; PRSOF ¶¶ 17, 18. As a result, McKenty was issued a written reprimand; advised that no retaliation would be tolerated; and made to undergo harassment training. DSOF ¶¶ 19, 20; PRSOF ¶¶ 19, 20. But Hubbard was not transferred to another supervisor, despite her request. PSOAF ¶ 27; DRPSOAF ¶ 27.

Hubbard testified at her deposition that she threw up on a nightly basis after learning this. *Id*. Her husband also testified that he saw Hubbard "curled up in a ball" and that she was "not acting like herself." *Id*.

In addition to the comments she reported internally, Hubbard testified that McKenty told her that "girls should be working behind a desk" and that he could picture the female employees in their bikinis. He also asked Hubbard to try on a team shirt to see if it fit. DSOF ¶ 22; PRSOF ¶ 22. She did not report these comments. *Id*.

On May 26, 2016, Hubbard again complained about McKenty. This time, Hubbard told National Sales Manager Michael Martin that: she was not receiving sufficient sales training and time from McKenty; he prioritized his deals over hers and took some of her sales leads; and she felt the two were in competition. DSOF ¶¶ 23-25; PRSOF ¶¶ 23-25. She told Martin that her complaints were different from and not related to the complaints she made to HR that April. DSOF ¶ 28; PRSOF ¶ 28.

Mondo testified similarly. Specifically (and among other things), that McKenty: did not give him credit for his work; took sales that belonged to him; failed to give him advice on what to do with customers and generally gave him little coaching, training or tools for success; belittled him with comments such as "use your head" and "don't be stupid;" prioritized his own work over Mondo's; wanted to fire Mondo; and was a bad manager. DSOF ¶ 29; PRSOF ¶ 29. Mondo testified further that he requested to be reassigned but that request was denied. *Id*.

**Attendance policies and absences.** Hubbard received a copy of Defendants' employee handbook ("Handbook") when she commenced employment. DSOF ¶ 16;

PRSOF ¶ 16. In addition to a zero-tolerance harassment and discrimination policy and procedure for reporting harassment and discrimination (and among other things), the handbook contains various policies regarding attendance. *See generally* DSOF, Ex. A. In particular, it states that "work schedules for employees vary throughout the organization;" supervisors are to advise employees on their work schedules; and "[p]oor attendance and excessive tardiness are disruptive" and "may lead to disciplinary action, up to and including termination of employment." PSOAF ¶¶ 1, 12; DRPSOAF ¶¶ 1, 12; DSOF, Ex. A at 34. The handbook also provides for paid time off and FMLA leave after one year of employment, as well as bereavement leave for those employed past the 60-day introductory period. DSOF ¶ 30; PRSOF ¶ 30; PSOAF ¶¶ 10, 11, 13; DRPSOAF ¶¶ 10, 11, 13. There is no teleworking policy.

According to Defendants, Medium Duty Sales Representatives are to report to the dealership five days a week, and are permitted to work remotely only as necessary to respond to customer calls. DSOF ¶ 10. Defendants cite McKenty's declaration in support. But Hubbard disputes that claim, pointing to: (1) her own deposition testimony that once she completed her training, McKenty allowed her to go into the field and told her she could work from home; (2) Mondo's deposition testimony indicating that he spent more time in the field than in the office; (3) Defendants' recruiter Michelle Olbrecht's testimony that there were days when she visited the Summit dealership and saw no salespeople; and (4) the Handbook, which indicates that work schedules "vary throughout the organization." PRSOF ¶ 10.

5

Hubbard was absent approximately 43 days during her eleven months of employment with Defendants, including due to four surgeries, and despite that she had not yet earned paid time off or leave under Defendants' FMLA policy. DSOF ¶¶ 32, 33 and Ex. A at 23-24; PRSOF ¶¶ 32, 33; R. 50, Ex. B. She initially took time off as follows:

- March 24 and 25, 2016 for a medical issue;
- April 2016 for the death of her brother-in-law;
- April 25, 2016 for a doctor's appointment; and
- April 26, 2016-May 2, 2016 for a surgery

DSOF ¶ 34; PROSF ¶ 34. Hubbard contends that McKenty excused her absences, and that such a stance was consistent with the Handbook. PRSOF ¶ 34. Hubbard points to the Handbook's bereavement policy, and to the portion of Defendants' "Paid Absence Allowance" policy that indicates that absences will be excused with a doctor's note, which she contends she provided where appropriate. *Id.* Defendants admit that Hubbard's absences were accommodated, but offer HR Manager LaJeunesse's declaration indicating that this was only because Defendants assumed the absences would come to an end. DSOF ¶ 35.

They did not. Hubbard was absent again from September 8-26, 2016 for another surgery, and then on September 30 because her daughter was ill. DSOF ¶ 36; PRSOF ¶ 36. She provided a doctor's note for each absence. PRSOF ¶ 36. Defendants represent that at this point they determined that Hubbard's absences needed to be formally addressed and her job expectations defined. DSOF ¶ 37.

Mondo was also having attendance issues, so Defendants issued coaching letters to both Hubbard and Mondo on October 17, 2016. The letters cited tardiness and absenteeism, and generally described job duties and work hours. DSOF ¶¶ 38, 39; PRSOF ¶¶ 38, 39. Hubbard was instructed that her schedule was 8:00 a.m. to 5:00 p.m. on Tuesdays and "floor days," when sales representatives were expected to handle sales floor traffic and calls, and 9:00 a.m. to 6:00 p.m. on the other days to accommodate her children's school schedule. DSOF ¶ 40; PRSOF ¶ 40. Mondo's schedule was 8:00 a.m. to 5:00 p.m. DSOF ¶ 42; PRSOF ¶ 42. Both Hubbard and Mondo were also assigned to rotating Saturdays, and instructed to be in the office before calling on customers unless previously arranged otherwise with management. DSOF ¶ 41; PRSOF ¶ 41.

Hubbard was absent again from November 14-16, 2016 complaining of back pain. DSOF ¶ 45; PRSOF ¶ 45. Shortly thereafter, Defendants asked the receptionist to keep a record of Hubbard's and Mondo's attendance. DSOF ¶ 46; PRSOF ¶ 46. Defendants' records reflect that Hubbard was absent in December 2016 and January 2017 as follows:

- December 8-9, 2016, due to a fever;
- December 12, 2016, because she had a contagious cold sore;
- December 13, 2016, because she was still contagious until noon:
- December 14, 2016, because her nose was "oozing bad":
- December 16, 2016, because her cold sore was "bleeding really bad";
- December 29, 2016, without explanation;
- January 3, 2017, because she was at the emergency room with her baby;
- January 4, 2017, because she was up all night with her crying baby; and
- January 4, 2017, through January 12, 2017 for a nasal surgery.

DSOF ¶ 47; PRSOF ¶ 47. Defendants' records also reflect that Hubbard was tardy on several occasions on the days she was in the office during that same period. DSOF ¶ 47; DSOF, Ex. B at 16.

On December 22, 2016, Martin and McKenty decided to place Hubbard on a Performance Improvement Plan ("PIP").[3] DSOF ¶ 50. But when Hubbard continued to call off work unexpectedly, they elected to terminate her instead. DSOF ¶ 51; DSOF ¶ 57; PRSOF ¶ 57.

Mondo also continued to have attendance issues, and was placed on a PIP on November 23, 2016. DSOF ¶ 58; PRSOF ¶ 58. His attendance improved thereafter, but by September 2017, Defendants determined that Mondo was becoming "more work to manage than the value he brings to our Company." DSOF ¶¶ 58-59; PRSOF ¶¶ 58-59. Mondo resigned before Defendants were able to terminate him. DSOF ¶ 60; PRSOF ¶ 60. According to McKenty, Mondo took 13 days off during his first year of employment. R. 50, Ex. B ¶ 16.

**EEOC Charge and lawsuit.** Hubbard filed a charge of discrimination with the EEOC on April 21, 2017 ("EEOC Charge"). DSOF ¶ 61; PRSOF ¶ 61. Hubbard checked the boxes for "sex" and "retaliation" on the form meant to indicate the bases of discrimination, and included the following description:

> I began my employment with Respondent on or about February 29, 2016. My most recent position was Medium Duty Sales Representative. During my employment, I was subjected to sexual harassment. I complained to Respondent to no avail. Subsequently, I was subjected to harassment, discipline, and discharge.

---

[3] Hubbard claims this was unsupported, but along with Martin and McKenty's declarations, Defendants offer a copy of the email itself. *See* R. 50, Ex. C.

> I believe that I have been discriminated against because of my sex, female, and in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.* at 11. Ultimately, Hubbard received a right to sue notice, and thereafter timely filed this lawsuit, in which she asserted the following claims: (1) hostile work environment based on sex; (2) sex discrimination; and (3) retaliation. Defendants seek summary judgment on each of them.

## Analysis

### I.     Hostile Work Environment

To survive summary judgment on a hostile work environment claim, a plaintiff must offer evidence that: "(1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016). Defendants argue that even assuming McKenty made all of the comments Hubbard says he did, those comments are not actionable as a matter of law. The Court agrees.

Title VII is not a "civility code." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998). A plaintiff must meet a "demanding standard," with evidence that goes "well beyond showing rudeness or incivility." *Demkovich v. St. Andrew the Apostle Par., Calument City*, 973 F.3d 718, 728 (7th Cir. 2020) (internal citations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not suffice. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). In determining whether conduct is actionable, courts consider "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993).

McKenty's comments fall short under this standard, being neither severe nor pervasive, nor objectively offensive under Seventh Circuit law. *Cf. Lapka v. Chertoff,* 517 F.3d 974 (7th Cir. 2008) ("assaults within the workplace create an objectively hostile work environment for an employee even when they are isolated"); *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir.2006) (hostile work environment claim could proceed where plaintiff's co-worker "made [vulgar] comments or gestures directly to [her] on a nearly daily basis and touched her on half a dozen occasions").

Hubbard offers the testimony of other female employees regarding similar comments McKenty allegedly made to them.[4] But none were made in Hubbard's presence, they also were not severe or pervasive, or objectively offensive. Summary judgment is proper on Hubbard's hostile work environment claim.

## II.    Sex Discrimination

A Title VII plaintiff's discrimination claim survives summary judgment if she presents evidence that, "considered as a whole," allows a reasonable jury to find that

---

[4] Specifically, Hubbard offers the testimony of Jessica Bumbaris, former receptionist at Defendants' Summit location, indicating that McKenty called people "cutie," and told her that she looked good with a tan and asked to see her sunburn. PSOAF, Ex. 15 at 21-22. And Michelle Olbrecht, Defendants' former corporate recruiter also testified that McKenty suggested that she hire another "blonde with big boobs." PSOAF, Ex. 1 at 11.

her protected characteristic caused the employer's complained-of action or inaction. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). One way in which a plaintiff can proceed is through the now-familiar *McDonnell Douglas* burden-shifting framework, under which she first must establish a prima facie case of discrimination, the employer then presents evidence of a non-discriminatory reason for its decision, and the burden ultimately shifts back to the plaintiff to establish that the employer's reason is pretextual. *Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016). To demonstrate a prima facie case under *McDonnell Douglas*, a plaintiff generally must show: (1) that she is a member of a protected class; (2) that she was performing her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that similarly situated individuals who were outside her protected class were treated more favorably. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). But ultimately, and regardless of the method of proof used, all evidence is placed "in a single pile," and the question is "whether the evidence would permit a reasonable factfinder to conclude that [the plaintiff's] [protected class] caused" the adverse action. *Ortiz*, 834 F.3d at 765-66.

Defendants argue that summary judgment is proper on Hubbard's sex discrimination claim because: (1) Hubbard failed to exhaust her claim before the EEOC; (2) Hubbard cannot establish a prima facie case of sex discrimination because she was not satisfying Defendants' legitimate business expectations, and lacks evidence that similarly situated employees were treated more favorably than she; and

(3) there is no evidence that Defendants' stated reasons for Hubbard's termination were a pretext for sex discrimination. The Court begins with the exhaustion analysis.

### 1.    Exhaustion

"Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256-57 (7th Cir. 2011) (quoting *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003)). But plaintiffs "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). Indeed, "[e]ven a charge that is not explicit in an employee's complaint will be deemed exhausted if the current claim reasonably could have developed from the EEOC's investigation of the charges before it," such that the EEOC charge and the complaint "describe the same conduct and implicate the same individuals." *Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 926 (7th Cir. 2018). In other words, claims are permissible even if not set forth in an EEOC charge if "there is a factual relationship" between the claims and charge. *Tyburski v. City of Chi.*, 964 F.3d 590, 601 (7th Cir. 2020). Further, "the Seventh Circuit accords plaintiffs substantial leeway in determining whether claims are reasonably related to an EEOC charge." *Reilford v. United Parcel Serv.*, 2008 WL 4865987, at *7 (N.D. Ill. July 8, 2008) (citing *Cheek*, 31 F.3d at 500).

Defendants contend that Hubbard's EEOC Charge lacked the specificity required to exhaust a claim for sex discrimination, and that a sex discrimination claim is not "reasonably related" to a hostile work environment claim simply because

both concern sex. Defendants also point out that the EEOC's investigative focus was on Hubbard's allegations about a hostile work environment and retaliation for having reported the alleged harassment. But the scope of the EEOC's inquiry does not control the exhaustion analysis. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir. 1992) ("the appropriate standard for measuring exhaustion is not those charges that the EEOC in fact considered, but those that were brought to its attention"). Moreover, as noted, Hubbard checked the box marked "sex" on her EEOC Charge, and indicated both that she "was subjected to harassment, discipline, and discharge," and had "been discriminated against because of [her] sex, female." Further, Hubbard's retaliation claim before the EEOC is based on the same events that underlie her discrimination claim here. Accordingly, Hubbard's sex discrimination claim is "reasonably related" to her EEOC Charge even assuming it is not directly captured by it. The Court thus declines to grant Defendants summary judgment for failure to exhaust.

### 2. Merits

Defendants next argue that Hubbard's sex discrimination claim fails on the merits. The Court notes at the outset that in addition to her termination, Hubbard includes as part of her claim her contention that she was not invited to various golf outings and other events because of her gender. But "not everything that makes an employee unhappy is an actionable adverse action." *Markel v. Bd. of Regents Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). And that includes being excluded from

such an outing.[5] *See Hubers v. Gannett Co.*, 2019 WL 1112259, at *6 (N.D. Ill. Mar. 11, 2019) (exclusion from client event not an adverse employment action); *see also Chisholm v. Foothill Capital Corp.*, 3 F. Supp. 2d 925, 937-38 (N.D. Ill. 1998) (exclusion from golf outing not an adverse employment action). The Court thus considers only Hubbard's claim that she was terminated because of her sex.

According to Defendants, Hubbard's history of absenteeism and failure to improve despite the counseling letter belies any contention that she was performing her job satisfactorily. Because Defendants' proffered reason for Hubbard's termination was her failure to meet legitimate expectations due to absenteeism, the court ordinarily "focus[es] on the question of pretext, bearing in mind that without sufficient evidence of pretext [Hubbard] cannot show that [she] was meeting [Defendants'] legitimate expectations." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009). But Hubbard argues that Defendants treated other employees with attendance issues more favorably, which results in the merging of *McDonnell Douglas*'s second and fourth prongs. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (merging second and fourth prongs where employer argued employee violated company policy that plaintiff claimed was applied in a discriminatory manner). Accordingly, and because the Court need not reach pretext absent evidence of a similarly situated comparator, the Court's analysis begins there.

---

[5] What is more, according to McKenty, Hubbard did attend company outings. *See* R. 50, Ex. B ¶¶ 11-14 (setting forth the client events and outings Hubbard attended, and explaining that employees could not attend outings that occurred on their scheduled "floor days"). Hubbard offers no testimony or other evidence to refute these representations.

The similarly situated analysis "generally requires the plaintiff to show that the comparator had the same supervisor, was subject to the same employment standards, and had engaged in conduct similar to that of the plaintiff." *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011). "[T]he critical question" for deciding whether two employees engaged in similar conduct is whether their conduct was "of comparable seriousness." *Coleman v. Donahue*, 667 F.3d 835, 851 (7th Cir. 2012). But ultimately, the similarly situated inquiry "simply asks whether there are sufficient commonalities on the key variables . . . to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination[.]" *Id.*

Hubbard contends that Mondo, James Lee, Steven Brostrom and Bill Rink are proper comparators because each of them also had attendance issues but were not terminated. And Hubbard argues that in addition to attendance problems (and unlike her), Rink, Brostrom, and Mondo all had performance issues. But the evidence establishes that Rink and Brostrom were Heavy Duty Sales Representatives with different duties, expectations and qualifications, and that they reported to New Truck Sales Manager David Wilkey, not McKenty. Further, Wilkey attested that neither Rink nor Brostrom had attendance problems. R. 50, Ex. 1 ¶¶ 10-14. And although Lee was employed as a Medium Duty Sales Representative and reported to McKenty,

McKenty attested that Lee did not have attendance issues either. R. 50, Ex. B ¶ 6. Hubbard offers no admissible evidence to the contrary.[6]

That leaves Mondo, who served as the only other Medium Duty Sales Representative at the Summit dealership during Hubbard's employment, shared the same duties, reported to the same supervisor, and also had been employed for less than a year during the events at issue. But while the parties agree that Mondo's work record was also hampered by attendance issues, and that Mondo was placed on a PIP whereas Hubbard was not prior to termination, they dispute whether Mondo's attendance issues were of comparable seriousness. Defendants offer McKenty's declaration indicating that Mondo "took 13 days off" during his first year of employment, while Hubbard "was absent approximately 43 days" during her eleven months of employment. R. 50, Ex. B ¶¶ 16, 17. Hubbard argues that she worked from home some of the days that she was out, and suggests that the Court cannot simply compare those numbers. Hubbard also contends that her absences should have been excused in any event to the extent they were for medical reasons supported by doctor's notes or due to a death in the family. But Hubbard fails to: (1) demonstrate that she was permitted to work remotely such that any days she did so should be subtracted from that 43-day total; (2) establish precisely which or even how many of the 43 days she was out of the office but working (and for what portion of such days) assuming

_____

[6] Indeed, Hubbard cites only to Olbrecht's deposition testimony that she heard "a lot of complaints" about "probably everybody in the sales department" (including Hubbard) regarding whether they were reporting their whereabouts to their managers. PSOAF, Ex. 1 at 24-26. But that's inadmissible hearsay.

that was permitted; or (3) acknowledge that other than the bereavement leave policy, none of the policies providing employee time off applied to her because she had been employed for less than a year. Accordingly, there is insufficient evidence from which a jury could conclude that Hubbard and Mondo were similarly situated.

But even if they were, no reasonable jury could conclude that Defendants' proffered reason for her termination was a pretext for sex discrimination. Pretext requires evidence that Defendants were "dishonest rather than simply foolish or unreasonable." *Schmitt v. Cent. Processing Corp.*, 675 Fed. App'x 615, 620 (7th Cir. 2017). As such, the question is not "whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).

Hubbard argues that the expectations regarding working from home were unclear, so her termination must have been because of her sex. She spends much energy highlighting that at hire, both she and Mondo understood that their schedules were flexible. And she suggests that because she had previously been granted flexibility and had not been formally disciplined for her attendance issues, any failure to provide that same flexibility going forward must have been due to discrimination. But it is well-settled that employers have a legitimate interest in ensuring their employees report to work. *See Rush v. McDonald,* 966 F.2d 1104, 1114-15 (7th Cir. 1992) (employer would be justified in terminating an employee who was absent for three days and did not give an explanation for her absences until she returned); *Hill*

17

*v. Norcomm Pub. Safety Commc'ns, Inc.*, 2010 WL 5390982, at *9 (N.D. Ill. Dec. 22, 2010) ("Absenteeism, *in and of itself,* can prevent an employee from meeting her employer's legitimate expectations."); *Ruiz v. F & C Indus., Inc.*, 2006 WL 2024242, at *4 (N.D. Ill. July 12, 2006). And even if expectations were unclear prior to the coaching letter, they were obvious thereafter.

Indeed, the coaching letter stated that Hubbard and Mondo were "to start each day in the office prior to calling on customers unless previously arranged with management." DSOF, Ex. B at 10. And it warned that "any additional performance issues or further violations of <u>any</u> company policies or procedures" would "likely lead to a written warning and/or disciplinary action up to and including termination." *Id.* at 11 (emphasis in original). Consistent with the coaching letter, Defendants' Handbook states that "[p]oor attendance" is "disruptive," and may lead to disciplinary action, up to and including termination of employment." DSOF, Ex. A at 34. The handbook does not contain a remote work policy.

Despite Hubbard's argument to the contrary, Mondo's deposition testimony also makes clear that he was expected to be in the office or visiting with customers out in the field; simply put, working from home was not permitted. Mondo testified that he did not work from home in part because "I don't think [McKenty] would like me to," including "because of how new I was." DSOF, Ex. E at 16-18. Mondo stated further that "If I'm not in the office, [McKenty] was hoping or requiring me to be out knocking on doors and see if I can get any sales or anything like that." *Id.* at 12-13. And while Hubbard claims that Mondo came in at various times, his testimony

18

reflects that to the extent he came in after his scheduled start time, he was either: (1) meeting with existing customers; or (2) stopping at businesses located on his way to the office in an attempt to acquire new ones. *Id.* at 21-22 (noting that when he did not arrive at the start of the shift it was because he was meeting with a customer, or "doing cold calls on my way in. Because I was taking 55, obviously there's a lot of business around it."). And he was required to keep McKenty informed of his whereabouts.[7] *Id.* at 55 ("in the beginning, [McKenty] was kind of like, just let me know if you're going to do cold calls. And after that, he was probably more like where are you going").

Further, Hubbard's own conduct belies any contention that she believed her absences weren't problematic. By way of example, Hubbard sent an email to Martin in November 2016 acknowledging and attempting to explain her absences, and stating "In no way shape or form am I trying to take advantage of this opportunity that M&K has allowed me to have." DSOF, Ex. C at 4. And she testified regarding that same email as follows:

> Q: We were talking about your communication to Michael Martin, and I believe I was asking you if you were worried about losing your job because you had taken so much time off; is that correct?
>
> A: Yes.

---

[7] Hubbard cites a collection of emails as supporting her assertion that Mondo was permitted to work from home. R. 35 at 13. In one such email from June 2017, Mondo told McKenty that he would "work from home to the best of [his] ability" despite calling off work sick. PSOAF, Ex. 20 at 5. But Mondo had been employed for more than one year at that point, and thus was entitled to take time off under Defendants' written policies. The record contains no other evidence that Mondo worked from home, and as noted, Mondo testified that he did not.

Q: Is that true that you were worried about losing your job?

A: Yes.

DSOF, Ex. D at 175-76. Further, Hubbard's text message to McKenty on the eve of her January 2017 surgery reflects her understanding of the burdens her absences placed on Defendants. *See* PSOAF, Ex. 6 at 16-17 ("I know this will bring stress on you [sic] I do apologize but there is nothing I can do to control this."). Finally, while Hubbard contends that she received mixed messages from management even after receiving the coaching letter, the evidence simply does not support that. Hubbard relies on her own deposition testimony indicating that National Sales Manager Michael Martin told her she could work from home in January 2017. But that is inadmissible hearsay that cannot ward off summary judgment, and she elected not to depose Martin. *MMG Fin. Corp. v. Midwest Amusemt. Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment."). She also points to her testimony that when she was at the office, she was told she should be out in the field, and when she was out in the field, she was told she should be in the office. But even assuming the truth of that allegation, it does not support her claim that she was permitted to work from home. Hubbard also contends that "things cited in the coaching letter was [sic] rarely happened." R. 35 at 10. But the only evidence she cites in support is Mondo's testimony that prior to the coaching letter, it was rare that he worked with his manager once per month making outside sales calls as the letter requires. DSOF, Ex. E at 11 and Ex. B at 13. That does not support that Hubbard could work from home either.

Finally, Hubbard points out that her termination letter cited multiple reasons for her termination, while Defendants now point to just one: absenteeism. But to survive summary judgment, Hubbard would have to demonstrate that *each* of the reasons Defendants gave were pretextual. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015) (plaintiff "would have to raise an issue as to pretext for each proffered concern to withstand summary judgment"); *see also Bodenstab v. Cnty. of Cook,* 569 F.3d 651, 659 (7th Cir. 2009) ("when a defendant has offered multiple nondiscriminatory reasons" for its decision, "showing that one . . . is pretextual is not enough"). She has not. Accordingly, there is insufficient evidence from which a jury could conclude that Defendants' stated reason for Hubbard's termination was a pretext for discrimination, and Hubbard's sex discrimination claim fails under *McDonnell Douglas*.

 Although neither party analyzes the issue, nor can Hubbard's claim survive under *Ortiz*. Indeed, other than her allegations of sexual harassment and the arguments set forth above, Hubbard points only to testimony indicating that Defendants' workforce is dominated by males—including at dealerships other than Summit—and suggesting that other female employees faced a lack of upward mobility. But Hubbard offers no evidence concerning the applicant pools for the various openings and/or why the hiring and promotional decisions were made. Indeed, she failed to depose a single decisionmaker. Accordingly, even considering all the evidence "as a whole," no reasonable jury could find that Hubbard's gender caused her termination. Summary judgment is proper on her discrimination claim.

## III. Retaliation

Title VII also prohibits employers from retaliating against an employee who "filed a complaint or participated in an investigation of an unlawful employment practice." *Robertson v. Dep't. of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing 42 U.S.C. § 2000e-3(a)). A plaintiff may demonstrate retaliation under *McDonnell Douglas*, beginning with a prima facie case that: (1) she engaged in protected activity; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated individuals who did not engage in protected activity were treated more favorably. 411 U.S. at 802. But again, the ultimate question is whether all the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's protected activity caused the adverse action. *Ortiz*, 834 F.3d at 765-66.

Defendants do not contest that Hubbard's April 2016 internal harassment complaint was a protected activity. But Defendants argue that summary judgment is proper on Hubbard's retaliation claim for the same reasons it was as to her sex discrimination claim. That is, because she cannot identify a similarly situated employee who was treated more favorably, she was not performing her job satisfactorily given her numerous absences, and she fails to put forth evidence that Defendants' proffered reason for her termination was pretextual or link her harassment complaint to her termination.

The Court agrees. As stated, there is insufficient evidence that Mondo's attendance issues were akin to and as extensive as Hubbard's. Further, the timeline

22

belies any inference of retaliation. Hubbard complained of sexual harassment in early April 2016, shortly after commencing employment with Defendants. Defendants immediately investigated and acted upon her complaint. Hubbard then was repeatedly absent, after which Defendants issued a coaching letter, she was absent repeatedly again, and then was terminated. There is no evidence that Defendants' reason for Hubbard's termination was a lie, and there is no admissible evidence to link her harassment complaint to her termination. Further, the Seventh Circuit has repeatedly concluded that shorter time frames than the nine-month span between Hubbard's harassment complaint and her termination were too lengthy to be "suspicious."[8] *See Jajeh v. Cty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012) (five-month gap not suspicious); *see also Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (six-month span "too long to infer a link"); *Carter v. Chi. State Univ.*, 778 F.3d 651, 658 (7th Cir. 2015) (seven-month span not suspicious). And as Hubbard concedes, suspicious timing alone is rarely enough to support an inference of retaliation in any case. *See* R. 35 at 21 (citing *Burnell v. Gates Rubber Co.*, 647 F.3d 704 (7th Cir. 2011) and *Sitar v. Indiana D.O.T.*, 344 F.3d 720, 728 (7th Cir. 2003)). But more to the point,

---

[8] Hubbard also contends that her May 2016 complaints regarding McKenty were protected activity, as was an internal complaint that McKenty told her she should eat lunch at her desk while working. But the former concerned McKenty's management style, not sexual harassment, and so was not protected under Title VII. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006). Further, there is no evidence that Hubbard linked the latter to her sexual harassment complaint when she complained about it to human resources, and her testimony reflects that McKenty's suggestion regarding her lunch break pre-dated her harassment complaint. *See* DSOF, Ex. D at 102-03, 108-09 (indicating that McKenty first suggested she eat lunch at her desk after her first surgery in March, and her complaint to HR Manager LaJeunesse was simply "Hugh is saying I have to eat my lunch at my desk.").

even if the timing were suspicious, Hubbard's intervening absences would eliminate any retaliatory inference. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) ("where a significant intervening event separate[es] an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail"). Simply put, "an employee's complaint of harassment does not immunize h[er] from being subsequently disciplined or terminated for workplace behavior." *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007). Summary judgment is proper on Hubbard's retaliation claim.

## Conclusion

The Court understands that Hubbard may feel that the decision to terminate her employment was unfair. But the fact that Hubbard disagreed with Defendants' decision is not relevant. Instead, "[t]he only question that matters is whether [Defendants] believed [they] had a legitimate basis to terminate [her.]" *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017). They did. Defendants' motion for summary judgment is granted, R. 28, and this civil case is terminated.

ENTERED:

_Thomas M Durkin_

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: November 30, 2020

24